UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| B & E JUICES, INC., | : | CIVIL ACTION NO.: |
| | : | 3:07CV1321 (MRK)(WIG) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| ENERGY BRANDS, INC., | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [DOC. # 7]

On August 31, 2007, Plaintiff, B & E Juices, Inc., ("B & E") filed the instant action against Defendant, Energy Brands, Inc.("Energy"), claiming, inter alia, that Energy's termination of its beverage distributorship agreement violated the Connecticut Franchise Act, Conn. Gen. Stat. §§ 42-133e - 42-133h. Among other relief, B & E seeks to enjoin the termination of the agreement and the parties' distributorship relationship, which will take place effective November 2, 2007, unless enjoined.

On October 10, 11, and 12, 2007, the Court held an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction. Prior to the commencement of the hearing, the parties consented to the jurisdiction of this Magistrate Judge, pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 73, to issue a final appealable ruling on the Motion for Preliminary Injunction.

Accordingly, after due consideration of the evidence presented and the parties' post-trial briefs, the Court hereby renders the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1.     Plaintiff B & E Juices, Inc., is a corporation organized and existing under the laws of the

1

State of Connecticut and has its principal place of business in Connecticut and is thus a citizen of Connecticut for diversity purposes.

2.      Defendant Energy Brands, Inc., is a corporation organized and existing under the laws of the State of New York and has its principal place of business in New York and is thus a citizen of New York for diversity purposes.

3.      B & E is a family-owned beverage distribution business, operated by Mitchell Clyne and his father Robert Clyne.  Mitchell Clyne, who is the Vice President of B & E, runs the business; his father, Robert Clyne, pays the bills.

4.      Energy manufactures a line of enhanced water products under the brand name "glaceau,"[1] including drinks known as "vitaminwater" and "smartwater" (collectively, the "Energy Products").

5.      In 1988, the Clynes purchased B & E, at the time a Snapple beverage distribution business covering the state of Connecticut.  Snapple sales comprised approximately 65% to 70% of B & E's business in 1988.  In 2006, Snapple continued to be B & E's number one brand with sales comprising 58% of B & E's business.  Mitchell Clyne testified that he has told Energy employees that Snapple was his number one priority.

6.      B & E's distributor agreement with Snapple restricted the other products that B & E could carry and required B & E to obtain Snapple's approval before carrying a new product.  Under the agreement, B & E agreed not to sell or carry any other natural juice or soda

---

[1] As part of its marketing scheme, Energy uses all lower case letters for the brand name "glaceau" and for the names of the individual Energy Products, such as vitaminwater and smartwater, and for the different flavors of each product, such as power-c, energy, revive, essential, focus, stress-b, and multi-v.  In fact, in most of its marketing materials, correspondence, memoranda, and even contracts, Energy employs only lower case letters.

(pop) products, or products similar to the Snapple products without the written consent of the company. Thus, in one instance, B & E decided not to carry Energy's vitaminwater tea because Snapple objected to its distribution of this tea product.

7.  Mitchell Clyne testified that since the early to mid-1990s, he has believed that B & E is a Snapple franchisee and has related this to Snapple. Prior to this lawsuit, he never advised Energy that he considered B & E to be an Energy franchisee.

8.  Until 2006, almost all of B & E's trucks carried the Snapple logo and its drivers wore clothing bearing the Snapple logo. Approximately two-thirds of B & E's coolers are branded with the Snapple logo. Mitchell Clyne's business card also carries the Snapple logo.

9.  Since the early 1990's, B & E's distribution territory has been limited to Fairfield County, Connecticut.

10. B & E purchases beverages from manufacturers and then resells those beverages to independent route owners (sub-distributors) who, in turn, sell the beverages to retailers. B & E distributes to all categories of stores in Fairfield County – chain stores (e.g., Stop & Shop, Shop Rite), club stores (e.g., Costco, B.J.'s), "up-and-down-the-street" businesses (e.g., gas stations, delicatessens), and food service accounts (e.g., corporate cafeterias, schools, colleges).

11. B & E has achieved widespread success for itself and its beverage manufacturers by hard work in growing the territory and providing excellent customer service to its accounts in Fairfield County, Connecticut.

12. Compared to many other beverage distributors, B & E takes on very few brands to

distribute because of the risk involved in distributing a new brand. In addition to taking up valuable "real estate," that is, limited shelf space, distribution of a new brand takes focus away from existing, core brands. Mitchell Clyne described himself as "picky" and "skeptical" about new brands and only takes those in which he believes, in order to limit his risk and protect his credibility with his customers, the stores.

13. In the mid-1990s, Mitchell Clyne met Darius Bikoff ("Bikoff"), the original owner of Energy, who was interested in B & E becoming an Energy distributor because of its distribution territory, Fairfield County, Connecticut, which was an upscale market. B & E began distributing Energy's product, glaceau water in a short bottle with a unique spike. B & E stopped distributing this product after about a year when Mitchell Clyne realized that B & E did not have an exclusive distributorship in its Territory with Energy.

14. In or around 2001, Energy Products were still relatively new in the marketplace, including Fairfield County, Connecticut. At the time, Energy was distributing Energy Products in Fairfield County, using a "man in the van" in an attempt to gain visibility for Energy Products.

15. In or around 2001, B & E had a successful business and had built up substantial goodwill distributing other brands of beverages within Fairfield County, Connecticut, including Snapple, Stewarts, Poland Springs, Mistic, Orangina, and Gatorade, and did not need Energy to succeed in business. Its lead brand was Snapple, and Mitchell Clyne considered B & E to be a "Snapple house."

16. Eventually, after conversations with other distributors and a member of the Board of Directors of Energy, in late 2001, B & E signed a Distribution Agreement with Energy

4

(the "Agreement"). Mitchell Clyne, who was represented by counsel, negotiated the Agreement with Mike Repole ("Repole"), who is now the President of Energy. B & E was among the first group of distributors to sign agreements to distribute Energy Products.

17.   Pursuant to the Agreement, Energy granted B & E a nontransferable, exclusive right to distribute Energy Products to retail customers in Fairfield County, Connecticut (the "Territory"). B & E was given the right to appoint sub-distributors, subject to prior written approval by Energy.

18.   The Agreement covered glaceau vitaminwater, glaceau smartwater, and all future brands delivered through the direct store delivery ("DSD") distributor network. All trademarks, tradedress, copyrights, and goodwill as they related to the Energy Products, packaging, images, merchandising, and advertising materials remained the sole and exclusive property of Energy. Energy granted to B & E the right, during the term of the Agreement, to use its trademark, tradedress, and product images to promote the goodwill and sale of Energy Products in the Territory.

19.   The Agreement set forth a quota or minimum number of cases that B & E was required to purchase as an initial stocking order, as well as a minimum annual purchase commitment. The initial stocking quota was 1,188 cases. The minimum purchase quota for 2001 was 15,000 cases, 40,000 cases for 2002, and thereafter to be determined based upon various market conditions. However, if the parties did not concur on a quota for a subsequent year, it was to be set, according to the Agreement, at 10% higher than the previous year's quota or 110% of actual purchases for the previous year, whichever was greater. B & E

agreed to maintain a minimum of a fifteen-day inventory of Product at all times.

20.    No one at Energy ever told Mitchell Clyne that B & E did not have to meet these quotas, and he testified that he considered them mandatory. He also did not consider the fifteen-day inventory to be optional. Someone from Energy would come to the B & E warehouse on almost a monthly basis to check the inventory, the flavors, and all the packages.

21.    B & E far exceeded the minimum purchase commitment for 2001 and 2002, selling 38,577 cases and 87,240 cases, respectively, in those two years. B & E does not claim to have been an Energy franchisee during this period.

22.    Thereafter, the parties never actually negotiated a minimum purchase commitment for any subsequent year, although Energy did provide B & E with annual goals as to how many cases it should try to sell in a given year based upon the past year's sales and growth of the brand. Energy did not set these goals or projections as a minimum purchase requirement; they were simply sales goals that were never contracted to, agreed upon, or signed off on by B & E. When B & E did not meet the sales goal for 2006, Energy did not attempt to terminate or threaten to terminate the Agreement.

23.    The Agreement also set forth distribution requirements of 25% for independent accounts within six months of the commencement of the Agreement and 50% within twelve months.

24.    The Agreement provided that B & E and Energy would contribute matching funds at the rate of $.50 per case to a Marketing Fund for media, visi-coolers, truck decals, and other merchandising materials to be mutually agreed upon. Mitchell Clyne and Tom Keeney of Energy orally modified this provision and agreed that B & E could bill back to Energy

80% of the purchase price of the cold equipment.

25.     The Agreement provided that B & E must use its best efforts to aggressively sell and
        promote the Energy Products to customers in its Territory, and that Energy would assist
        with the marketing of the Energy Products within the Territory.  All proposed marketing
        materials had to approved in advance by Energy.

26.     Under the Agreement, Energy agreed to develop and implement brand strategies for
        Products with assistance from B & E; to develop national, regional, and local marketing
        data, strategies, programs and activities; and to furnish such information to B & E.
        Energy also agreed to provide B & E with pricing information, sales literature, and
        technical assistance, as needed.

27.     Since 2001, Energy has presented hundreds of marketing promotions to B & E, and B &
        E has substantially participated in almost all of them relating to the Energy Products that
        B & E distributes.   (B & E did not participate in the glaceau promotion for its tea product
        in 2003, which B & E could not distribute because of its Snapple agreement.)

28.     Energy has an aggressive, all-inclusive marketing strategy that targets its distributors as
        well as its consumers, e.g., by addressing its distributors as "partners."  In a marketing
        roll-out for 2007, Energy told its distributors that "together we are glaceau."

29.     Mitchell Clyne testified that Energy had the "most amazing point of sale" or "POS"
        marketing, which includes stickers affixed to the coolers and refrigerators, cardboard
        stand-ups of celebrities -- a very specific POS marketing.  B & E's customers had access
        to all the "bells and whistles, everything that goes along with the trademark, with the
        brand."  Mr. Clyne described glaceau's sales and marketing materials as the best he had

seen in twenty years.

30.	Energy holds large meetings, "glaceau summits," once or twice a year, in an offsite location (e.g., Foxwoods, Atlantic City). B & E is expected to attend the glaceau summits, and Mitchell Clyne has attended these summits on behalf of B & E. Energy uses these summits to present marketing plans for the upcoming year (oral presentations and slide shows) and to discuss distributor commitments.

31.	Energy provides marketing plans for its distributors, which consist of various types of marketing presentations and promotions (e.g., chain ad memos, chain promo ads, chain promotion announcements, promotional planners, chain authorization memos, advertising campaigns, incentives, challenges, slide shows, dvds, e-mails) and marketing specific POS or point of sale (e.g., stickers for coolers and refrigerators, banners, cardboard stand-ups). Mitchell Clyne testified that B & E was expected to follow these, which B & E generally does, although it has negotiated the price that B & E must pay to Energy for these promotions. B & E has never come up with its own marketing promotion or program for Energy Products.

32.	Mitchell Clyne testified that when Energy would introduce a marketing program for a particular product (e.g. the flu fighter program which focused on the glaceau enhanced water product called defense), B & E was expected to have ample inventory of that product in distribution to support the program. Mr. Clyne did not consider this optional.

33.	Mitchell Clyne testified that he did not negotiate the terms and conditions of the Energy marketing programs, although he did admit to negotiating B & E's monetary contributions to the cost of the marketing programs. Indeed, Michael Fierro testified that

Mr. Clyne negotiated the funding amount for virtually every promotion presented to the chains.

34. After a presentation by Energy in late 2005, Mitchell Clyne testified, he felt pressure to agree that B & E would become an "A+" distributor, which involved a ten cent (10%) per case marketing fee, rather than an "A" distributor, which involved no additional cost. Energy did not require its distributors to be A+ or A distributors. B & E chose to implement the A+ plan.

35. B & E did not always follow the promotions to the letter. For example, in 2007, B & E did not believe that the smartwater challenge would be effective in Fairfield County. Mitchell Clyne made some "tweaks" to it. He discussed this with Paul Consorte, Energy's Regional Sales Manager for the metro New York area. Energy did not threaten to terminate B & E for not following the promotion to the letter.

36. B & E's warehouse contains Energy branding, such as a Shaquille O'Neal cardboard stand-up, banners, and current "point of sale" materials. There is no branding on the outside of the warehouse, however, or other branding visible to the general public at B & E's location. Energy employees have point of sale displays for the chain stores at B & E's warehouse.

37. Under the terms of the Agreement, within ten (10) days of the end of each month, B & E was required to deliver to Energy a written report showing the monthly depletions of Product for each item, year-to-date sales for each item, the number of active accounts, and sales to chain accounts.

38. B & E provides Energy with a monthly depletion report showing the number of cases

sold.  No one from Energy ever told Mitchell Clyne that these reports were not required, and he did not consider them to be optional.   However, B & E does not provide Energy with copies of B & E's financial reports, such as their profit and loss statements.  Energy has never requested to inspect the books and records of B & E.

39.    Energy sells its Products to B & E.  B & E then sells these Products to its sub-distributors. Energy has no involvement in the pricing between B & E and its sub-distributors.  B & E pays Energy for these Products at the end of the month, deducting from the amount due B & E's reimbursements for marketing and promotional expenses, or "bill backs."  B & E submits monthly bill backs to Energy at an agreed upon rate in order to recover money laid out by B & E in connection with marketing promotions and chain authorizations, and/or the purchase of cold equipment, or point of sale.  Mitchell Clyne negotiated a bill-back rate on all new Energy marketing programs or promotions but did not negotiate the terms and conditions of the programs or promotions.  A higher bill-back rate affects only the economics between Energy and B & E.  It does not change the front line price paid by B & E's chain or club store customers for Energy Products.

40.    The Agreement provided that the prices paid by B & E for the Product were to be established by Energy and could be changed upon thirty (30) days written notice.

41.    Energy determines which products and flavors (SKUs)[2] B & E can sell to its chain store customers; B & E has no role in deciding which SKUs can be sold to its chain store

_____

[2]  A SKU or Stock Keeping Unit is a unique identifier for each of the distinct products and services that can be ordered from a supplier. Usage of the SKU system is rooted in data management and enables a merchant or distributor to systematically track its inventory, such as in warehouses and retail outlets.  http://en.wikipedia.org/wiki/Stock_Keeping_Unit.  Throughout the trial, the parties referred to particular flavor of a beverage as a "SKU."

customers and cannot put an unauthorized SKU into a chain store. Energy also sets the price at which B & E's chain store customers buy Energy Products from B & E's sub-distributors (the "front line price"). B & E plays no role in negotiating this front line price and cannot change this front line price. Energy utilizes chain authorization memos to tell B & E which SKUs to place in a chain store, what the front line price is, where the Energy Products should be placed, the day the order must be executed, and the discount or promotion, if any, to be given to the chain store customer. Energy, however, at the request of Mitchell Clyne, frequently had to provide B & E with financial concessions, usually in the form of increased margins on these accounts.

42.     Energy also sets the front line price for B & E's club store customers; B & E has no role in negotiating this front line price and cannot change this front line price. Energy determines which SKUs B & E can sell to its club store customers; B & E has no role in deciding which SKUs could be sold to its club store customers. Further, Energy directs B & E to make deliveries to B & E's club store customers at specified times.

43.     Energy does not set the front line price for B & E's up-and-down-the-street customers, although it does provide recommendations. Mitchell Clyne testified that B & E never changes the front line prices of Energy Products to its up and down the street customers without the knowledge and consent of Energy. On at least one occasion, Mike Repole told Mitchell Clyne that he could not change the front line price charged to up and down the street customers. However, Michael Fierro, a former regional sales manager with Energy, testified that on several occasions, B & E had changed the front line prices it was charging without the prior knowledge or consent of Energy.

44.  The Agreement specifically prohibited the transhipment of Product outside the Territory, without the prior written permission of Energy.

45.  The Agreement was for an indefinite term, until terminated, <u>inter alia</u>,

    a.    by either party, for cause upon at least thirty (30) days written notice;

    b.    by either party for breach by the other party of a material provision of the Agreement, which breach is not cured within thirty (30) days written notice;

    c.    by Energy, if B & E should fail to purchase and pay for the Minimum Purchase Volumes; and

    d.    by Energy "without cause at any time upon 60 days advanced written notice to [B & E].  If [B & E] is terminated by [Energy], or its successor, for any reason other than cause, the terminating party will pay to [B & E] an amount equal to six dollars ($6.00) times the number of cases of Product sold to retail, accounts in the Territory by [B & E] during . . . the twelve (12) months immediately preceding termination."  (Agreement ¶ 11.4).

Upon termination of the Agreement, B & E was permitted to continue to sell its remaining inventory of Product.  Additionally, Energy agreed to repurchase from B & E all unused Product in its inventory at B & E's cost plus a ten percent (10%) handling fee. This termination provision was negotiated between Mitchell Clyne and Mike Repole. Energy had wanted the Agreement to run for a term of five years, but B & E insisted on a perpetual term.  B & E, through its attorney, also negotiated the buy-out provision which would come into play if the Agreement was terminated without cause.

46.  The Agreement provided that it was to be governed by and construed and enforced in

accordance with the laws of New York and could not be modified except in writing.

47. Since 2001, B & E has distributed Energy Products in Fairfield County, Connecticut
pursuant to this Agreement and the relationship between the parties, earning a substantial
profit on such sales and causing Energy's business to increase in Fairfield County.

48. B & E determines its days and hours of operation.

49. B & E makes its own hiring and firing decisions.

50. In mid-2006, B & E hired Rene Ferellec as its glaceau brand manager and gave him the
title of "Director of Hydrology." Energy did not require B & E to hire Ferellec. John
Askling of glaceau provided management training to Ferellec. Rene Ferellec's business
card bears the glaceau trademark, as does the business card of James Fischer, Vice
President of Sales for B & E. Mr. Ferellec focuses his attention on the Energy Products,
although he has also done presentations relating to non-Energy Products, including
Muscle Milk and Switch.

51. Today, B & E has over twenty (20) employees, not including B & E's sub-distributors
and their employees, which is the largest number of employees B & E has ever had. B &
E operates from a 40,000 to 45,000 square foot warehouse in Bridgeport, Connecticut,
which includes office and overflow space. This is the largest space B & E has ever
occupied. B & E's warehouse does not have any signage that describes the business or
identifies any particular brand that it distributes. Today, B & E has ten (10) sub-
distributorships, three (3) of which are "house routes" owned by B & E and seven (7) of
which are "equity routes" owned by the sub-distributors.

52. B & E has fifteen trucks. It was not until 2006 that any of B & E's trucks were branded

with Energy's logo.[3]  Energy had urged, but not required, that the trucks be branded with its logo.  Presently, four (4) of the trucks have the Energy's logo. One of the trucks is branded with a Muscle Milk logo.   The remaining ten (10) trucks continue to carry the Snapple logo.  Mitchell Clyne testified that B & E had planned to re-decal its house route trucks (two more trucks) with Energy's trademark prior to its receipt of the termination letter from Energy.  However, in light of the termination letter, this never happened.

53.     Energy provided B & E with leather portfolios, with the words "glaceau", "vitaminwater," "fruitwater," and "smartwater" on them, for B & E's sales managers and sub-distributors to use as a sales tool that would identify them as representatives of glaceau.

54.     Energy often offered to B & E wearables (e.g., shirts, jackets, vests) bearing the glaceau brand names for B & E's employees, sub-distributors, and sub-distributors' employees; some of these wearables were given to B & E by Energy and some of them were purchased from Energy by B & E.  Energy, however, did not require B & E employees or sub-distributors or their employees to wear Energy branded uniforms and did not require B & E to purchase any of the Energy branded wearables.  B & E did not require its sub-distributors or their employees to wear clothing bearing any particular brand name or logo.

55.     Energy never required a written business plan from B & E.

56.     B & E has thousands of coolers in Fairfield County, Connecticut.  Approximately one-

_____

[3] This was accomplished by "wrapping" the truck in a plastic wrap bearing pictures of glaceau products.

third of these coolers are branded with the glaceau trademark. Additionally, Energy products are shelved in B & E's Snapple coolers. Energy, however, has never required B & E to purchase any of its coolers.

57.     In any given week, Energy has had an employee and sometimes up to two interns at B & E's warehouse or out in the trade with a route driver or salesman at least three full days a week.

58.     Two customers, Wild Oats in Westport, Connecticut, and the thirty-four (34) CVS stores throughout Fairfield County, Connecticut, only purchase glaceau Products from B & E and their cold equipment is branded only with the glaceau trademark. These customers do not purchase any other products that B & E distributes. In fact, B & E, through the efforts of its glaceau brand manager Rene Ferellec, was the first Energy distributor in the United States to place a cooler in a CVS location, and Energy sent out a nationwide e-mail congratulating B & E for this accomplishment.

59.     During 2007, B & E began using letterhead which carried the glaceau trademarks, vitaminwater and smartwater, in addition to the Snapple trademark.

60.     In August 2006, an Indian conglomerate named Tata purchased thirty percent (30%) of Energy for $650 million. At the time, Darius Bikoff told reporters that he intended to change Energy's independent distributor network into the glaceau network, and Mike Repole told reporters that this investment was good news for Energy's employees, distributors and retailers, who were responsible for Energy's success, and that this investment would ensure Energy's continued independence.

61.      On or about May 25, 2007, Coke announced that it had agreed to purchase the stock of

Energy for $4.1 billion in cash, to provide Coke with a strong platform to grow its active lifestyle beverages. Coke's press release announcing the acquisition stated, "We look forward to discussing with glaceau's distributors and our bottling partners the best operating model for glaceau's routes-to-market."

62.    On May 25, 2007, B & E received a letter from Mike Repole advising the distributors that "during the next few months we will be meeting with each of you to discuss [Energy's future distribution strategy]." This meeting never took place, at least with respect to B & E.

63.    Coke's purchase of Energy closed on or about June 7, 2007.

64.    On or about August 30, 2007, Energy sent a letter to B & E stating that it was terminating the Distributorship Agreement effective November 2, 2007. The letter stated,

> Please be advised that [Energy] has decided to change the distribution network in your territory and surrounding area and therefore will be terminating the above-referenced Agreement. In connection therewith, this letter shall constitute the required written notice of the termination of the Agreement. As such, please take note that the Agreement shall be deemed terminated and of no further force and effect as of Friday, November 2, 2007 (the "Termination Date").
> . . . .
> [Energy] shall pay to [B & E] a termination payment in an amount calculated in accordance with the terms of the Agreement.

65.    The cover letter attached to the termination letter was addressed to "dear distribution partner," and thanked the distributor for its "tremendous support and partnership over the years."

66.    No "cause" for termination was articulated in the termination letter and no one at Coke or Energy has ever articulated to B & E any "cause" for the termination. In fact, Energy has

16

never sent B & E a default letter or other letter purporting to terminate their relationship for cause.

67. Mike Repole testified that the reason Energy is terminating B & E's distributorship of Energy Products is the opportunity provided by Coke and its bottling network, Coca Cola Enterprises ("CCE"), which is the largest distribution network in the United States; the termination has nothing to do with B & E or its performance.

68. In approximately twenty percent (20%) of the United States market, Coke and Energy have determined that staying with the independent distributors in New York, Los Angeles, Buffalo, and Alabama will not impair their plans for the brand because the existing distributors can do a better job than CCE in these markets. In fact, Energy has specifically decided to keep the important markets of New York and Los Angeles, which are considered unique and incubation markets for the launch of new products, in the hands of its independent distributors. The other distributors that are not being terminated have a distributorship agreement with a specific term that has not expired.

69. Although Muhtar Kent, President and COO of Coke, stated that Coke and Energy were going to go "channel-by-channel" and "market-by-market" to evaluate the best route to market for Energy Products, Energy and Coke did not analyze each and every market in the United States when they were determining the best route to market in each location, and also did no such analysis when they ultimately made the decisions to terminate particular distributors; in this regard, Energy specifically did not analyze the market in Fairfield County, Connecticut.

70. Energy intends to terminate the Agreement with B & E on November 2, 2007. It will pay

17

B & E a buy-out of $6.00 per case for the number of cases sold during the preceding twelve (12) months, which it estimates to be 435,000 cases. The total buy-out figure will be approximately $2,610,000. Energy provided B & E with a termination package, which stated, _inter alia_, that glaceau would not be buying back any inventory from the distributors, but that they would be permitted to sell existing inventory, which was different that the Agreement, which required Energy to buy back the inventory at cost plus ten percent (10%). The termination package also stated that B & E must turn over its customer list and must sign a release before it will be paid the buy-out. At the hearing, Energy represented that it will, regardless of any other communication, abide by the Agreement with respect to the termination.

71.  After the termination of the Agreement with B & E, Energy will be competing with B & E in Fairfield County, and B & E will be competing with Energy.

72.  In the event that Energy terminates the Agreement, it will distribute Energy Products in Fairfield County, Connecticut through Coke's captive and/or affiliated distribution companies, thereby depriving B & E of the goodwill it has built up in distributing Energy Products and of the value that B & E has built due to its distribution of Energy Products.

73.  The distribution and sale of Energy Products currently constitutes approximately thirty to forty percent (30-40%) of B & E's business. Since 2001, it has been a "straight line up." B & E reported 38,425 glaceau cases sold per month on average for the rolling twelve (12) months July 2006 through June 2007, which is 35.06% of its total cases sold; glaceau business accounted for 33.67% of B & E's business during this period. B & E reported 234,725 glaceau cases sold for calendar year 2006, which was 23.79% of its total

cases sold; B & E reported 171,064 glaceau cases sold for calendar year 2007 through June only, which was 30.35% of its total cases sold. (This does not include summer 2007, which saw the biggest sales in the history of the glaceau brand.) Energy estimates that B & E's sales of glaceau products for the twelve-month period November 2006 to November 2007 will be 425,000 cases, which represents close to 40% of B & E's business for calendar year 2007 through November.

74. B & E's income from sales has steadily increased from 2000 to 2006; income from sales was $9,969,055.90 in December 2000, $10,110,704.99 in December 2001, $11,477,862.64 in December 2002, $11,397,975.56 in December 2003, $12,416,303.30 in December 2004, $13,745,381.89 in December 2005, and $14,074,510.12 in December 2006. For the period July 2006 through June 2007, B & E's total sales of Energy Products was $5,395,735.00; for calendar year 2006, B & E's total sales of Energy Products was $4,375,308.00; and for calendar year 2007 (through June 2007), B & E's total sales of Energy Products was $3,145,160.

75. Absent the glaceau sales, B & E's 2006 income from sales would be about the same as its income from sales in 2000.

76. If B & E loses the glaceau products, B & E will also lose its accounts at the thirty-four (34) CVS stores located in Fairfield County, Connecticut and at the Wild Oats store in Westport, Connecticut, as these accounts purchase only Energy Products from B & E.

77. Mitchell Clyne described the enhanced water beverages as the "hottest" category of beverages on the market, with glaceau being the leader in that area.

78. Snapple has announced that it will soon be distributing a new enhanced water product,

Snapple Functional Water, that will compete with glaceau.  B & E was offered the distribution rights for this product in Fairfield County but declined.

**Conclusions of Law**

1.	This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

2.	In the Second Circuit, the standard governing motions for preliminary injunctions is well-settled.  To obtain a preliminary injunction, a plaintiff must show a threat of irreparable injury <u>and</u> either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.   <u>Time Warner Cable v. Bloomberg L.P.</u>, 118 F.3d 917, 923 (2d Cir. 1997); <u>McKinnon v. Wysocki</u>, No. 3:06cv147, 2007 WL 234690, at *6 (D. Conn. Aug. 16, 2007); <u>Allied Office Supplies, Inc. v. Lewandowski</u>, 261 F. Supp. 2d 107, 108 (D. Conn. 2003).

3.	"Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, . . . and the alleged injury must be one incapable of being fully remedied by monetary damages." <u>Reuters Ltd. v. United Press Int'l, Inc.</u>, 903 F.2d 904, 907 (2d Cir. 1990).

4.	"Likelihood of success on the merits does not require that the party demonstrate that success is an absolute certainty, rather the party need only show that the probability of his prevailing is better than fifty percent."  <u>United Rentals (North America), Inc. v. Myers</u>, No. 3:03cv589, 2003 WL 23507021, at *1 (D. Conn. Apr. 23, 2003) (citing <u>Abdul Wali</u>

v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)).

5.     Additionally, the Connecticut Franchise Act specifically authorizes injunctive relief as a remedy for violations of the Act.  Conn. Gen. Stat. § 42-133g(a).

6.     In this case, B & E seeks a preliminary injunction restraining Energy, its agents, employees, and all those acting in concert with Energy, from (i) illegally terminating the Agreement; (ii) illegally terminating the relationship between the parties; (iii) using Coke's captive and/or affiliated distribution companies to distribute Energy Products in Fairfield County, Connecticut; and/or (iv) otherwise depriving B & E of the exclusive right to sell and distribute Energy Products in Fairfield County.

7.     Energy's termination of the Agreement with B & E was without cause, at least as "cause" is delineated in the Agreement.  Pursuant to the terms of the Agreement, Energy was entitled to terminate the Agreement without cause upon sixty (60) days written notice to B & E.

8.     Thus, to circumvent this termination provision, B & E seeks to invoke the protections of the Connecticut Franchise Act, Conn. Gen. Stat. §§  42-133e - 42-133h, to prevent Energy from terminating the Agreement without cause.  B & E asserts that it has a franchise relationship with Energy and that under the Connecticut Franchise Act, a franchisor may only terminate a franchise for good cause.  Conn. Gen. Stat. § 42-133f(a).

9.     Although the Agreement between the parties contained a choice-of-law provision stating that New York law would govern, the Connecticut Franchise Act specifically provides that "[a]ny waiver of the rights of a franchisee under sections 42-133f or 42-133g which is contained in a franchise agreement . . . shall be void."  Conn. Gen. Stat. § 42-133f(f).

Additionally, section 42-133g(a) provides that "[a]ny franchisee may bring an action for violation of sections 42-133e to 42-133g, inclusive, in the Superior court to recover damages sustained by reason of such violation." Based on these sections, the courts have generally addressed the applicability of the Connecticut Franchise Act in cases involving a purported franchisee located in Connecticut, even in the face of a choice-of-law provision applying the law of another state or forum selection clause placing jurisdiction in another forum. See Bowmount Corp. v. Krombacher Brauerei Bernhard GmbH & Co., No. 3:02cv1969, 2003 WL 22205615, at *4 (D. Conn. Sept. 8, 2003); Contractors Home Appliance, Inc. v. Clarke Distribution Corp., 196 F. Supp. 2d 174, 176-77 (D. Conn. 2002); McKeown Distributors, Inc. v. Gyp-Crete Corp., 618 F. Supp. 632, 643 (D. Conn. 1985). Thus, despite the parties' agreement that New York law should apply, the Court will consider the applicability of the Connecticut Franchise Act.

10.     The pivotal issue in this case is whether B & E is a franchisee under the Connecticut Franchise Act. For purposes of Plaintiff's Motion for Preliminary Injunction, the Court must determine whether B & E has established a likelihood of success on the merits as to this issue.

11.     The Franchise Act's "remedial purpose, to prevent a franchisor from unfairly exerting economic pressure over a franchisee, indicates that the statute should be read broadly in favor of the [franchisee]." Hartford Elec. Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 345 (1999).

12.     The Connecticut Franchise Act defines "franchise" as an oral or written agreement or arrangement in which

22

> (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system <u>prescribed in substantial part</u> by a franchisor, . . .; and (2) the operation of the franchisee's business pursuant to such plan or system is <u>substantially associated</u> with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer . . . and a distributor. . . .

Conn. Gen. Stat. § 42-133e(b) (emphasis added).

13. The Connecticut Franchise Act defines "franchisor" as "a person who grants a franchise to another person, including a manufacturer, refiner or producer or a distributor, wholesaler or jobber who grants to a distributor, wholesaler or jobber or retailer, as the case may be, the authority to use a trademark, tradename, service mark or other identifying symbol or name under a franchise." Conn. Gen. Stat. § 42-133e(c). A "franchisee" is defined as "a person to whom a franchise is granted, including a distributor, wholesaler or jobber or retailer who is granted the authority under a franchise to use a trademark, tradename, service mark or other identifying symbol or name." Conn. Gen. Stat. § 42-133e(d).

14. "The first element [under Conn. Gen. Stat. § 42-133e(b)] requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." <u>Chem-Tek, Inc. v. General Motors Corp.</u>, 816 F. Supp. 123, 127 (D. Conn. 1993).

15. "'As to the second prong of Conn. Gen. Stat. § 42-133e, requiring that the operation of the franchisee's business be substantially associated with the franchisor's trademark . . .

23

or other commercial symbol,' the Connecticut Supreme Court has held that, while the statute does not require that a putative franchisee carry exclusively franchisor-trademarked products, a showing of a 'dependen[ce] on the public's confidence in the franchised product for most or all of [the franchisee's] business' is required." Contractors Home Appliance, Inc. v. Clarke Distribution Corp., 196 F. Supp. 2d 174, 178 (D. Conn. 2002) (quoting Hartford Elec. Supply, 250 Conn. at 358 & n. 25).

16.    The label given to the relationship by the parties, while relevant, is not determinative of the existence of a franchise relationship. Nor is the relationship of the parties governed solely by the parties' written agreement.  Rather, the statutory test is "whether the parties' conduct, in addition to their words, constitutes an agreement or arrangement" under the Connecticut Franchise Act.  Hartford Elec. Supply, 250 Conn. at 348; see also Edmands v. Cuno, Inc., 277 Conn. 425, 439 (2006) (holding that the legal significance of the relationship is fixed by reality, not by what the parties call it, though descriptive language may be relevant).

17.    As to the initial inquiry under the first prong of the definition of "franchise," there is no question that Energy gave B & E the right to offer, sell and distribute its goods.

18.    The second inquiry under the first prong of the "franchise" definition is more difficult: Did Energy substantially prescribed a marketing plan for the offering, selling or distributing of goods or services by B & E?  "While there is no precise formula as to how many or what factors create the level of control indicative of a franchise, . . . [m]any federal courts have cited . . . .  Consumers Petroleum of Connecticut, Inc. v. Duhan, 38 Conn. Supp. 495 (1982), for its list of factors establishing substantial prescription of a

marketing plan or system, pursuant to § 42-133e(b)." Hartford Elec. Supply, 250 Conn. at 350. Those factors include (1) the hours and days of operation; (2) advertising; (3) lighting; (4) employee uniforms; (5) prices; (6) trading stamps; (7) hiring; (8) sales quotas; and (8) management training. Id. Courts have also looked at whether the franchisor provided the franchisee with financial support, audited its books, or inspected its premises. Contractors Home Appliance, 196 F. Supp. 2d at 178; see also Edmands v. Cuno, 277 Conn. 425, 439 (2006). There is no precise set of factors, nor does any one factor control. Logically, the factors to be considered largely depend on the type of business that is involved.

19. Applying the relevant factors to the evidence presented in this case, the Court finds that Energy did not control B & E's hours or days of operation. It also did not require B & E employees or its sub-distributors or their employees to wear a particular uniform. Energy was not involved in the hiring or firing of B & E employees, nor did it control the number of B & E employees or the number of sub-distributors, although the Agreement did provide that the appointment of sub-distributors by B & E was subject to Energy's approval. B & E retained ultimate hiring and firing authority.

20. As to management training, there was little evidence concerning Energy's providing management training, although Energy did provide training to Rene Ferellec after he was hired as the glaceau brand manager. Additionally, a certain amount of training took place at the glaceau summits, which B & E was required to attend. There was no evidence, however, that Energy required B & E's employees or sub-distributors to be trained by Energy.

21. With respect to pricing, Energy controlled the prices B & E paid for the Product, but it had no control over what B & E charged its sub-distributors. Energy also controlled the front line prices charged to the national customers, the chain stores and the club stores. Although Mitchell Clyne often negotiated concessions to increase his profit margin on these accounts, Energy controlled the front line prices charged to these customers. As for the up-and-down-the-street customers, Energy suggested prices but B & E set these prices, although on at least one occasion Energy objected to an increase in price. Thus, overall, while Energy controlled some of the front line pricing, there was a significant portion of the pricing that it did not control, including the prices charged by B & E to its sub-distributors. See Edmands, 277 Conn. at 444. Additionally, B & E was able to negotiate bill back concessions with respect to some of the prices set by Energy, which offset to some degree the control that Energy had over pricing.

22. As to sales quotas, the Agreement itself referred to the minimum sales commitments as "quotas" and provided that B & E's failure to purchase and pay for at least the minimum purchase volumes was ground for termination by Energy. Minimum purchase volumes were only set for the first two years of the Agreement. Thereafter, no specific minimum purchase requirements were ever agreed upon by the parties. Instead, Energy provided B & E with annual sales goals. In 2006, when B & E did not meet its goal, Energy did not take steps to terminate the Agreement or declare B & E in default. Moreover, Energy did not dictate how B & E was to achieve these annual sales goals, a factor which the Connecticut Supreme Court found to be significant in the Edmands case. 277 Conn. at 448.

23.    With respect to advertising or marketing, perhaps the factor to which the parties devoted

the most attention at trial, Energy clearly held the reigns as to the marketing of Energy

Products, but it did not limit the advertising and marketing that B & E could perform for

other manufacturers.   Energy provided national, regional, and local marketing strategies,

programs, and materials.  The level and intensity of its marketing efforts were what B &

E found so attractive about representing Energy. According to Mitchell Clyne, there was

no one else like Energy in the industry.   B & E contributed $.20 per case to a Marketing

Fund for media, visi-coolers, truck decals, and other merchandising materials.  Energy

presented B & E with hundreds of marketing promotions, and B & E substantially

participated in almost all of them, although frequently negotiating the amount of the bill

back for these promotions.  B & E never developed its own marketing promotion for

Energy Products.  However, B & E was not limited to advertising Energy Products.  The

majority of its trucks carried the Snapple brand.  Most of its coolers were Snapple

coolers.  Its employees wore Snapple branded clothes, as well as glaceau brands.

Mitchell Clyne's business card bore the Snapple label, although Mr. Ferellac and Mr.

Fischer had business cards with the glaceau label.  B & E's stationary bore only the

Snapple brand until recently when it added smartwater and vitaminwater.  There was no

advertising on B & E's warehouse identifying it as an Energy distributor.  Thus, B & E

has substantial discretion as to marketing its overall business.

24.    In terms of financial reports, while B & E was required to provide Energy with a monthly

depletion report showing the number of cases sold, as well as a monthly bill to recover

bill backs, B & E never provided Energy with financial reports, such as profit and loss

statements, and Energy never requested to examine or audit B & E's books and records nor did it require audited financial reports.

25. The evidence also demonstrated that Energy frequently had an employee at B & E, often three days a week, as well as one or more interns, and that these employees did inspect B & E's inventory of Product and also accompanied some of the distributors on their routes, which inevitably would have provided an opportunity for inspection of the Product and its display at the point of sale. However, there was no evidence that this Energy employee dictated to B & E how to run its business or interfered with its manner of operations.

26. There was also evidence that Energy required B & E to maintain a fifteen-day level inventory and to make sure that it had sufficient Product to support ongoing promotions. There was no evidence that Energy exercised any further control over B & E's stock levels.

27. Energy did control the SKUs that B & E could sell to the chain and club stores.

28. Energy did not restrict other products that B & E could distribute.

29. Energy did not require B & E to provide it with a business plan nor did it monitor its overall business operations.

30. In terms of financial support, Energy did provide assistance to its distributors to help cover the cost of promotions, chain authorizations, point of sale marketing, and the purchase of refrigeration equipment. However, these rates were subject to negotiation, a practice which B & E took advantage of, probably more than any other distributor.

31. The evidence also showed that Energy controlled B & E's sales territory, which was limited to Fairfield County and prohibited transshipping outside of the Territory.

32. When the Court weighs all of these factors, it finds that B & E did not engage in the business of offering, selling, or distributing goods under a marketing plan prescribed in substantial part by Energy.  As in the Edmands case, 277 Conn. 425, the Court finds that B & E was able to exercise independent judgment on most aspects of its business.  While Energy clearly provided significant marketing assistance with respect to Energy Products, it did not exercise sufficient control over the manner in which B & E conducted its business to render the relationship between the parties a "franchise," as that term is defined by statute and as it has been interpreted by the courts.  See Edmands, 277 Conn. at 440.  Thus, B & E has failed to meet the first prong of the definition of a "franchise." See Conn. Gen. Stat. § 42-133e(b).

33. Additionally, the Court finds that the operation of B & E's distribution business was not "substantially associated" with Energy's trademark, trade name or advertising.

34. While the distribution and sale of Energy Products constituted approximately thirty to forty percent of B & E's business in 2007, Snapple has always been its number one brand. B & E has considered itself a "Snapple house."  Snapple restricted the products that it could carry; and, on at least one occasion, B & E declined to distribute a glaceau tea product because Snapple refused to give it permission to do so.  Most of its trucks are branded as Snapple trucks.  Most of its coolers are Snapple coolers.

35. That is not to say that the market does not also associate B & E's name with the glaceau brand or Energy Products also.  Since 2001, B & E has been the only distributor of these products in Fairfield County, a major market for glaceau.  Clearly, B & E has contributed significantly to the growth of this brand in Fairfield County and to the development of

good will with the point of sale customers.

36. To meet the "substantially associated with" test of the second prong, the statute does not require exclusivity or complete association. <u>Hartford Electric Supply</u>, 250 Conn. at 358. Instead, the word "substantially" depicts the level of association required. <u>Id.</u>  The courts have repeatedly held that the statute does not require a franchisee's entire business to be associated with the franchisor's trademark. <u>See</u> <u>Sorisio v. Lenox, Inc.</u>, 701 F. Supp. 950, 961 (D. Conn. 1988); <u>Hydro Air of Connecticut, Inc. v. Versa Tecnologies, Inc.</u>, 599 F. Supp. 1119, 1125 (D. Conn. 1984), <u>overruled on other grounds by</u> <u>Grand Light & Supply Co. v. Honeywell, Inc.</u>, 771 F.2d  672 (2d Cir. 1985).

37. Some federal courts have looked at the likely result of a disassociation of the parties to determine how dependent or associated the "franchisee" is on the "franchisor" and its trademarks. <u>See</u>, <u>e.g.</u>, <u>Sorisio</u>, 701 F. Supp. at 961.  In this case, while B & E would immediately lose as much as forty percent (40%) of its sales volume, it still has a significant number of beverages to distribute, primarily Snapple products.  It also has the opportunity to pick up the new Snapple fortified water products, which are designed to compete with the glaceau enhanced water products.  At least initially, it will lose its CVS accounts, as well as Wild Oats, but these are the only customers which are solely glaceau customers.  It will retain the rest of its customers and will have the opportunity to build on the goodwill that it has established over the years with these customers and to sell to them any new brands that it chooses to distribute.   Admittedly, it will be competing with the Coke distributors, who will now be handling the distribution of glaceau.  But, it will have received a significant buy-out which will go a long way toward bridging the

financial gap until it can rebuild its business. This is not a case where the purported franchisee is completely dependent on the public's confidence in the franchised product for most or all of its business and where abrupt severance of the franchise, without good cause and sufficient notice, could spell ruination. See Grand Light & Supply Co. v. Honeywell, Inc., 771 F.2d 672, 677 (2d Cir. 1985); Contractors Home Appliance, 196 F. Supp. 2d at 178. This clearly is not a case where the purported franchisee's entire business will fail. See Hartford Electric Supply, 250 Conn. at 360; see also Rudel Machinery Co. v. Giddings & lewis, Inc., 68 F. Supp. 2d 118, 124-28 (D. Conn. 1999) (finding that no "substantial association" existed where the sales of a putative franchisor's products constituted approximately forty-one percent (41%) of the putative franchisee's business and the gross profits attributable to those products was approximately forty percent (40%)).

38.     Thus, the Court concludes that there was not a franchise relationship between the parties, as that term is defined by the Connecticut Franchise Act, and therefore, the Act does not apply. Accordingly, B & E is not entitled to invoke the provision of the Act requiring "good cause" for the termination of the relationship between the parties.[4]

39.     Having so found, the Court concludes that B & E has not met its burden of showing a substantial likelihood of success on the merits and, thus, is not entitled to the issuance of

_____

[4] The Court notes that, as persuasively argued by Defendant, there may well be good cause for termination under the Franchise Act in light of the substantial benefits to Energy offered by the nationwide Coke distribution network. The Court, however, need not decide that issue. Moreover, having found that Plaintiff has not carried its burden as to the likelihood of success prong, the Court need not decide whether Plaintiff can show irreparable harm if the injunction is not granted. The Court, however, has serious doubts as to whether that standard can be met.

a preliminary injunction.

## **Conclusion**

Accordingly, for the reasons set forth above, the Court DENIES Plaintiff's Motion for a Preliminary Injunction [Doc. # 7].

SO ORDERED, this ___25th___ day of October, 2007, at Bridgeport, Connecticut.


_____/s/ *William I. Garfinkel*_____
WILLIAM I. GARFINKEL
United States Magistrate Judge